IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

SILMA S. GAUTIER,

Plaintiff,

v.

MEGAN J. BRENNAN, POSTMASTER
GENERAL,

Defendant.

CIVIL NO. 17-2275 (CVR)

## OPINION AND ORDER

## INTRODUCTION

Plaintiff Silma S. Gautier ("Plaintiff" or "Gautier") filed the present employment discrimination action against Defendant Megan J. Brennan, Unites States Postmaster General ("Defendant" or "the agency") alleging unlawful discrimination under the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. §621 ("ADEA") and on the basis of sex under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§2000.[1] Plaintiff is currently retired from the United States Postal Service.   Plaintiff alleges discriminatory harassment and hostile work environment based on age and gender when she was not invited to certain meetings, was not adequately trained, was issued inadequate warnings and was denied mentoring, to the point that she was forced

---

[1] Although Defendant's motion for summary judgment argues against and requested dismissal of retaliation claims, no such claims were raised in the Complaint. See Docket No. 1, p. 1, ¶ 1: "This is an action for damages, injunctive and equitable relief brought by plaintiff Silma S. Gautier for willful violation of her civil and employment rights by his (sic) employer due to age discrimination and gender discrimination which discrimination resulted in a hostile work environment that forced plaintiff to seek an early retirement."   The federal retaliation statute is not cited or even mentioned in the Complaint.  Finally, Plaintiff's opposition does not discuss this claim either.  As such, the Court will not address it in the present Opinion and Order.

Silma S. Gautier v. Megan J. Brennan, Postmaster General
Opinion and Order
Civil 17-2275 (CVR)
Page 2

to retire.    Plaintiff claims these opportunities were instead afforded to less qualified, male, and younger employees.

Defendant now seeks summary disposition of all claims, contending that, as a matter of law, all claims must be dismissed against her. (Docket No. 26).   Pending before the Court are Defendant's Motion for Summary Judgment (Docket No. 26); Plaintiff's opposition (Docket No. 31); Defendant's Reply to Plaintiff's opposition (Docket No. 40); and Plaintiff's Sur-reply (Docket No. 45).

For the reasons explained below, Defendant's Motion for Summary Judgment is GRANTED.

## STANDARD

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56 (c).  Pursuant to the language of the rule, the moving party bears the two-fold burden of showing that there is "no genuine issue as to any material facts," and that he is "entitled to judgment as a matter of law." Vega-Rodríguez v. Puerto Rico Tel. Co., 110 F.3d 174, 178 (1st Cir. 1997).

After the moving party has satisfied this burden, the onus shifts to the resisting party to show that there still exists "a trial worthy issue as to some material fact." Cortés-Irizarry v. Corporación Insular, 111 F.3d 184, 187 (1st Cir. 1997).  A fact is deemed "material" if it potentially could affect the outcome of the suit. Id.  Moreover, there will only be a "genuine" or "trial worthy" issue as to such a "material fact," "if a reasonable fact-finder, examining the evidence and drawing all reasonable inferences helpful to the

party resisting summary judgment, could resolve the dispute in that party's favor." Id. At all times during the consideration of a motion for summary judgment, the Court must examine the entire record "in the light most flattering to the non-movant and indulge all reasonable inferences in the party's favor." Maldonado-Denis v. Castillo-Rodríguez, 23 F.3d 576, 581 (1st Cir. 1994).

The First Circuit Court of Appeals has "emphasized the importance of local rules similar to Local Rule 56 [of the District of Puerto Rico]." Hernández v. Philip Morris USA, Inc., 486 F.3d 1, 7 (1st Cir. 2007); see also Colón v. Infotech Aerospace Servs., Inc., 869 F.Supp.2d 220, 225-226 (D.P.R. 2012). Rules such as Local Rule 56 "are designed to function as a means of 'focusing a district court's attention on what is -and what is not- genuinely controverted.' " Calvi v. Knox County, 470 F.3d 422, 427 (1st Cir. 2006)).

Local Rule 56 imposes guidelines for both the movant and the party opposing summary judgment. A party moving for summary judgment must submit factual assertions in "a separate, short, and concise statement of material facts, set forth in numbered paragraphs." Loc. Rule 56(b). A party opposing a motion for summary judgment must then "admit, deny, or qualify the facts supporting the motion for summary judgment by reference to each numbered paragraph of the moving party's statement of facts." Loc. Rule 56 (c). If they so wish, they may submit a separate statement of facts which they believe are in controversy. Time and again, the First Circuit has highlighted that facts which are properly supported "shall be deemed admitted unless properly controverted." Loc. Rule 56(e); P.R. Am. Ins. Co. v. Rivera-Vázquez, 603 F.3d 125, 130 (1st Cir. 2010) and Colón, 869 F.Supp.2d at 226. Due to the importance of this function

to the summary judgment process, "litigants ignore [those rules] at their peril."

Hernández, 486 F.3d at 7.

It is worth noting that in the present case, Plaintiff's opposition to Defendant's statement of uncontested material facts is procedurally non-compliant with the Local Rules, for two reasons. First, Plaintiff failed to controvert any of the facts offered by Defendant. Second, Plaintiff proffered an additional set of facts in her opposition, yet failed to offer any record citation in support thereof, in direct violation to this district's anti-ferreting rule which prevents 'the recurrent problem of ferreting through the record' and 'the specter of district judges being unfairly sandbagged by unadvertised factual issues.' " Domínguez v. Eli Lilly and Company, 958 F.Supp. 721, 727 (D.P.R. 1997). See García Sánchez v. Roman Abreu, 270 F. Supp. 2d 255, 259 (D.P.R. 2003) ("The anti-ferret rules serves one crucial purpose. It lays out the material facts in dispute clearly for a district court that is swamped with an overwhelming number of civil and criminal dispositive motions").

Consequently, the Court deemed admitted all of Defendant's proffered facts which were properly supported by evidence on the record.

## UNCONTESTED FACTS

### Prior Administrative Process:

### Consolidated Cases No. 4b-006-0049-014 And 1b-007-0008-015

1. Plaintiff filed two (2) complaints before the U.S. Postal Service Equal Employment Opportunity Commission ("E.E.O.C."), to wit, Case Nos. 4B-006-0049-014 and 1B-007-0008-015. These two complaints were

consolidated into a single complaint, EEOC Case No. 510-2015-00142X. D. Exhibit 1.

2. On June 23, 2017, the EEOC issued a decision by an Administrative Law Judge, where it found against Plaintiff and in favor of the Postmaster General. The Postmaster General then issued a Notice of Final Action dated July 6, 2017.  D. Exhibit 1.

3. The original E.E.O.C. Complaints were for sex and age discrimination (4B-006-0049-14) and harassment due to age and retaliation discrimination (1B-007-008-015). D. Exhibit 2; D. Exhibit 3.

4. On October 15, 2014, the Postal Service acknowledged the amendment to Plaintiff's E.E.O.C. Complaint for harassment based on sex (gender) and age. D. Exhibit 2A.

5. As a result of the foregoing amendment, the Postal Service issued to Plaintiff an "Acceptance for Investigation" for harassment based on sex and age and retaliation in the consolidated case as to the following alleged incidents:

   a. Discrimination and retaliation due to a hostile work environment based on age, gender and retaliation when:

      i. On June 5, 2014, Plaintiff was issued a Letter of Warning for unsatisfactory performance.  D. Exhibit 2B.

      ii. On unspecified dates, Plaintiff was excluded from participating in new In-Plant Support projects and was released from some of her assignments, which were given to other employees. D. Exhibit 2B.

iii.  On unspecified dates, Plaintiff was denied or excluded from training for various programs and was not allowed to participate in certain meetings.  D. Exhibit 2B.

iv.  On unspecified dates, Plaintiff was not selected to be mentored.  D. Exhibit 2A.

v.  On unspecified dates, Plaintiff was not trained to run all the reports in In-Plant Support Office.  D. Exhibit 2A.

vi.  On December 1, 2014, Plaintiff's tour was changed from Tour 2 to Tour 3, and then on December 3, 2014, it was changed back again.  D. Exhibit 3A.

vii.  On or about December 1, 2014, Plaintiff's supervisor constantly checked the status of the tasks assigned to her.  D. Exhibit 3A.

viii.  On December 1, 2014 and December 5, 2014, Plaintiff's supervisor would not approve her requests for sick leave without documentation. D. Exhibit 3A.

ix.  Plaintiff felt forced to retire, effective February 1, 2015. D. Exhibit 3A; D. Exhibit 7.

6.  As to all these claims, the same ones Plaintiff brings forth in the instant case (except the retaliation claim), the E.E.O.C. found against Plaintiff and for Defendant.

## Facts Related to All Issues

7.  Plaintiff is a female born on September 17, 1951 and was over 60 years at the time relevant to the actions in the complaint. D. Exhibit 7, item 10.

8.  Plaintiff began her employment with the U.S. Postal Service in 1983 and retired in year 2015.  D. Exhibit 7, items 16, 79, & 84.

9.  By year 2010, Plaintiff held the position of Operations Support Specialist. D. Exhibit 7, item 52.

10. Plaintiff identified Manager Jose Calserrada ("Manager Calserrada") as the management official responsible for the alleged discriminatory harassment due to sex and age (Case 4B-006-0049-14).  D. Exhibit 4, p. 2, ¶ 6.

11. Plaintiff identified Theresa O'Keefe ("O'Keefe") as the management official responsible for the alleged discriminatory harassment due to age and retaliation in Case No. 1B-007-008-015.  D. Exhibit 3, p. 1, block 12.

12. From January 2014 through mid-June 2014, Manager Calserrada acted in place of Daniel Fineman ("Manager Fineman") as the In-Plant Support Manager for the San Juan United States Postal Service Processing and Distribution Center ("P&DC").  Manager Calserrada is male and was born in 1969. At all times relevant, Manager Calserrada was 45 years old, was aware that Plaintiff is female, and was unaware of Plaintiff's exact age but guessed her to be "in her late 50's".  D. Exhibit 5, pp. 1-2; ¶¶ 3, 6-11.

13. Jack Lapp ("Manager Lapp") is an Operations Support Specialist (EAS23) in Dallas, Texas. Between May 27 and August 8, 2014, Manager Lapp also acted in place of Manager Fineman as the P&DC In-Plant Support Manager.

Manager Lapp is male, was born in 1964, and was aware the Plaintiff is female. At all times relevant to the complaint, Manager Lapp was 50 years old and was unaware of Plaintiff's age. D. Exhibit 6, pp. 1-2; ¶¶ 1, 3, 6-11.

14. Effective May 18, 2013, Efraín Reyes ("Reyes") was promoted from a position as a Mails Processing Clerk (PS06) to a position as an Operations Support Specialist position (EAS-17) at the P&DC. Reyes is identified as male and was born in 1981. At all times relevant, Reyes was approximately 33 years old. D. Exhibit 27.

15. On or about January 25, 2013, Eric Sierra ("Sierra") was temporarily detailed into a position as a Data Collection Technician (PS06) at the San Juan P&DC and acted in that position until approximately October 3, 2014. Sierra was promoted into a Data Collection Technician position on October 4, 2014. Sierra is male and was born in 1978. At the times relevant to this complaint, Sierra was approximately 36 years old. D. Exhibit 5, page 8, ¶45; D. Exhibit 28; D. Exhibit 29.

<u>Material Facts Related to Letter of Warning</u>

16. Plaintiff alleges discriminatory harassment based on sex and age when on June 5, 2014, she was issued a Letter of Warning ("LOW") for unsatisfactory performance. D. Exhibit 2, p. 2, section C, ¶ 1.

17. The duties of an Operations Support Specialist include updating computerized mail sorting programs. D. Exhibit 8, p. 1, ¶ 3.

18. In July 2003, Plaintiff received 32 hours of Sort Programs Systems ("SPS") training and underwent a refresher training in January, 2014.  D. Exhibit 5, p. 3, ¶¶ 15-16.

19. In an email dated May 1, 2014, Eugenio Santa Barbara ("Santa Barbara") notified Manager Calserrada that the updating of sortplan 481 caused the comingling of mail that should have been separated.  D. Exhibit 9.

20. On or about May 2, 2014, Manager Calserrada conducted an official discussion with Plaintiff because her lack of attention had caused operational mail sortation errors reported on May 1, 2014.  D. Exhibit 5, p. 3, ¶ 17.

21. In an email dated May 9, 2014, Santa Barbara notified Manager Calserrada that the updating of sortplan 485 caused mail to be mis-sorted. D. Exhibit 10.

22. In an email dated May 12, 2014, Edgardo Santiago ("Santiago") notified Plaintiff that there were continued problems with sortplan 485 and requested that the matter be investigated. Manager Calserrada was copied in the email. D. Exhibit 11.

23. In an email dated May 14, 2014, Santiago notified Plaintiff that there were continued problems with sortplan 485 and requested again that the matter be investigated. D. Exhibit 12.

24. In an email dated May 27, 2014, Santa Barbara notified Manager Calserrada that changes had been made to sortplan 485 without his knowledge which

caused them to have no sorting plan in place to carry out mail sorting.  D. Exhibit 13.

25. On May 27, 2014, Manager Calserrada spoke with Plaintiff regarding the mistakes she continued to make when using the sorting systems. D. Exhibit 5, p. 3, ¶ 20.

26. In an email dated June 4, 2014, Manager Calserrada notified Plaintiff that a particular mail sortation plan that she had been working on the previous week had not been properly updated.  D. Exhibit 14.

27. On June 5, 2014, Manager Calserrada issued a Letter of Warning ("LOW") to Plaintiff for unsatisfactory performance, specifically citing operational problems and setbacks resulting from her actions. Manager Calserrada issued this LOW to Plaintiff because she had repeatedly made similar mistakes in a short period of time.  D. Exhibit 15.

28. In an email dated August 12, 2014, Jose Rodríguez notified Nancy Rivera that the retention period on file of the June 5, 2014 LOW issued to Plaintiff would be for five (5) months. D. Exhibit 16.

29. Plaintiff alleges that Reyes was treated more favorably than she was when Reyes made a sorting point sequence error in February 2014 and a delivery point sequence error in May 2014 and was not disciplined. D. Exhibit 4, p. 7, ¶ 20.

30. In May 2014, Manager Calserrada conducted an official discussion with Reyes to discuss a mistake Reyes made while using the delivery point

sequence sort program. No further action was required as the mistake did not occur again. D. Exhibit 5, p. 4, ¶ 25.

31. On May 3, 2013, Manager Calserrada issued a LOW for unsatisfactory performance to Samuel Robles ("Robles").  Calserrada cited the same violations to the employee manual as in the LOW issued to Plaintiff.  D. Exhibit 17.

32. On or about May 3, 2013, Manager Calserrada also issued a LOW to Higinio Rodríguez ("Rodríguez") for unsatisfactory performance. Calserrada cited the same violations to the employee manual as in the LOWs issued to Plaintiff and to Robles.  D. Exhibit 18.

Material Facts Related to Plaintiff's Alleged

Exclusion and Release from Projects

33. Plaintiff alleges discriminatory harassment based on sex and age when she was excluded from participating in new In-Plant Support projects and released her from existing projects.  D. Exhibit 2A.

34. More specifically, Plaintiff alleges that: (a) in April and May 2014, Manager Calserrada assigned Reyes the task of coordinating the 24-Hour Clock project and the Integrated Operating Procedures meetings, and that she was not considered for the assignment; (b) from March to June 2014, Manager Calserrada assigned Reyes the task of coordinating the Lean Mail Project when the employee who regularly did this task transferred out of the San Juan P&DC, and that she was not considered for the assignment; and (c) in March 2013, Manager Calserrada released her from performing tasks and

assignments related to the Management Operating Data System ("MODS") and instructed her to train Sierra to perform those tasks. D. Exhibit 4, pp. 9-10, ¶¶ 25-28.

35. The San Juan P&DC In-Plant Support office develops subject matter experts within its staff of Operations Support Specialists; the San Juan P&DC Operations Support Specialist subject matter responsibilities and specializations had been previously established and assigned by Manager Fineman. D. Exhibit 5, p. 6, ¶ 30.

36. In an email dated April 10, 2013, Manager Fineman instructed Manager Calserrada to make certain that Plaintiff understood that "it is her responsibility to make the data techs 100% ready to take over MODS entirely, though she will continue to review for missing volume." D. Exhibit 19.

37. Manager Calserrada was responsible for distributing and balancing the In-Plant Support staff workload while he was acting in place of Manager Fineman; Plaintiff "had her hands full" with sort program maintenance tasks, and Calserrada therefore gave Plaintiff assistance performing MODS-related tasks. D. Exhibit 5, pp. 6-8, ¶¶ 30, 38-42.

38. Any San Juan P&DC In-Plant Support Staff member could be released from any project and assigned to work on any other project with higher priority at any given time. D. Exhibit 5, pp. 6-8, ¶¶ 30, 38-42.

39. Plaintiff was involved in projects where the required work was of Plaintiff's primary areas of responsibility and expertise. D. Exhibit 5, p. 7, ¶ 34- 35, 37; D. Exhibit 6, pp. 3-4, ¶¶ 17-19.

40. The purpose of the Integrated Operating Plan meetings was to coordinate and validate transportation between Field Offices and Processing and Distribution Centers; the required attendees were limited to Transportation Managers, Customer Service Managers, and Plant Managers; and Plaintiff was not involved in these meetings because her areas of specialty and expertise were in no way related to said plan.  Reyes' involvement with the meetings was limited to scheduling and taking notes. D. Exhibit 5, p. 11, ¶¶ 58-61, p. 19, ¶ 83; D. Exhibit 6, pp. 7-8, ¶¶ 32, 40-41.

41. Reyes was already performing 24-Hour Clock tasks prior to Calserrada's designation as acting manager.  D. Exhibit 5, page 6, ¶30, page 27, ¶ 117.

42. Reyes was involved with the lean mail processing project because he had received training essential to involvement in that particular project, specifically PostalCAD training, and Plaintiff had not.  D. Exhibit 5, pp. 18-19, ¶ 82.

43. The San Juan Operations Support Specialists cannot be involved in every activity and project, and the Specialists are assigned to projects based on the purpose of the project and the individual's particular skills. D. Exhibit 6, pp. 3-4, ¶¶ 13-19.

44. Reyes was released from performing Plant Verified Drop Shipment audits due to his workload, and that task was reassigned to another employee. D. Exhibit 5, p. 9, ¶ 46.

## Material Facts Related to Plaintiff's Alleged Exclusion from Training and Meetings

45. Plaintiff alleges discriminatory harassment based on sex and age when: (1) she was not provided a response she found satisfactory to requests for training made in April 2014; and (2) from March to May 2014 she was not invited to meetings to which other employees were invited.  D. Exhibit 4, p. 10, ¶ 28; pp. 15-16, ¶¶ 45-48; p. 18, ¶¶ 52-54; p. 19, ¶¶ 56-58.

46. Decisions regarding whether to offer training to employees and regarding which employees should receive training are the exclusive right of the management and are based on the operational needs of the company and the employee's individual needs. D. Exhibit 5, p. 10, ¶¶ 54-55; D. Exhibit 6, p. 8, ¶¶ 36-37.

47. In an email dated April 11, 2014, Manager Calserrada offered developmental training to all San Juan P&DC In-Plant Support staff, including Plaintiff.  D. Exhibit 21.

48. Plaintiff expressed interest in the Sort Program Fundamentals course. Manager Calserrada consented to Plaintiff's request because he felt it would solidify her mail sortation program maintenance skills. D. Exhibit 5, p. 10, ¶ 50; D. Exhibit 22.

49. No later than May 6, 2014, Manager Calserrada enrolled Plaintiff in the sort program fundamentals course, which Plaintiff attended, and where she

received 40 hours of training.  D. Exhibit 5, pp. 10-11, ¶ 56; D. Exhibit 22; D. Exhibit 31, p. 1.

50. Plaintiff alleges that Reyes was treated more favorably than she was, as Manager Calserrada and Lapp provided Reyes with formal and informal training that she did not receive. D. Exhibit 4, p. 10, ¶ 28; p. 16, ¶ 47; p. 20, ¶ 51.

51. Acting Manager Calserrada did not enroll Reyes in any formal training while he was occupying said position. Between January and June 2014, Reyes received one formal classroom training course (PostalCAD Standardization; March 17, 2014) and one web-based training course (The No FEAR Act; June 25, 2014). Manager Fineman arranged for Reyes to attend the formal PostalCAD classroom training course. Agency employees can take web-based courses at any time without managerial approval.  D. Exhibit 5, ¶¶ 64, 82; D. Exhibit 30; D. Exhibit 20, p. 1.

52. Manager Lapp spent more time with Reyes than he spent with Plaintiff during relevant time period because Reyes was involved in some projects that required managerial supervision and, because Plaintiff was more knowledgeable than Reyes, she required less managerial time and supervision.  D. Exhibit 6, p. 9, ¶ 46; p. 13, ¶ 60; p. 15, ¶ 72.

53. During the relevant time period, Plaintiff attended the meetings that involved her and/or pertained to her subject matter responsibilities and expertise. Management offered to teach Plaintiff how to conduct Service

Meetings, but she declined.  D. Exhibit 5, p. 10, ¶¶ 50-51; D. Exhibit 6, pp. 7-8, ¶40-41.

### Material Facts Related to Plaintiff Allegedly not Selected to be Mentored

54. Plaintiff alleges discriminatory harassment based on sex and age when from March to August 2014 she was not selected to be mentored. Plaintiff alleges that between March and June 2014, she observed Manager Calserrada mentor Reyes and give him on-the-job training while she did not receive the same.  D. Exhibit 4, p. 12, ¶. 87.

55. Mentoring by the acting In-Plant Support Managers was not formally provided to the San Juan P&DC In-Plant Support employees while they were acting in the place of Manager Fineman, but rather, they answered questions regarding the work performed by and addressed the concerns of the San Juan P&DC In-Plant Support staff, including Plaintiff.  More time was spent with Reyes than Plaintiff because Reyes was more inexperienced and involved with some projects that required managerial supervision. D. Exhibits 5, pp. 19-22, ¶¶ 83-97; D. Exhibit 6, pp. 13-16, ¶¶. 60-74.

### Material Facts Related to Plaintiff Allegedly Not Being Trained
### to Run All In-Plant Support Reports

56. Plaintiff alleges discriminatory harassment based on sex and age when Manager Calserrada did not teach her to run all the reports in In-Plant Support Office while he was acting Manager. D. Exhibit 4, pp. 35-39, ¶¶ 92-104.

57. Running the Run Plan Generator ("RPG") reports and acting as primary SPS editor had been the responsibility of an employee who transferred out of the San Juan P&DC in February 2014, and that responsibility for these two tasks was distributed evenly between Plaintiff and Reyes. Plaintiff was assigned SPS tasks because it was one of her primary areas of expertise and Reyes was temporarily assigned to run the RPG reports until such time as a replacement for the transferred employee was hired. D. Exhibit 5, p. 27, ¶¶ 117.

58. Reyes was already running the 24-Hour Clock and Service Indicators reports when Calderrada took over as acting Manager. D. Exhibit 5, p. 27, ¶ 117.

59. There are three different DPS Projected Volume reports: (1) one run daily from Monday through Friday between 7:00 p.m. and 8:00 p.m.; (2) one run on Saturday morning; and (3) one run on Sunday mornings. Plaintiff's schedule (Monday through Friday from 7:00 a.m. to 4:00 p.m.) precludes her from running any of these reports. D. Exhibit 5, p. 28, ¶117.

60. In-Plant Support staff members teach each other how to run reports and Plaintiff knew how to run all of the In-Plant Support reports. D. Exhibit 5, pp. 4-5, ¶¶ 100-109; D. Exhibit 6, pp. 16-17, ¶¶ 77-86.

61. During the relevant time period of the complaint, O'Keefe was the Senior Operation Support Specialist (EAS-20) at the San Juan P&DC. She served as Plaintiff's immediate supervisor from October 2014 to January 2015. D. Exhibit 24, p. 1, ¶¶ 1-3.

62. During the relevant time period of the complaint, Edelio Galindo ("Galindo") was the Senior Plant Manager (EAS-21) of San Juan P&DC. Plaintiff worked under a manager that Galindo supervised. D. Exhibit 25, pp. 1-2, block 3; ¶¶1-3, 6-8.

### Plaintiff's Claim That Her Tour Was Changed

63. On December 1, 2014, Plaintiff alleges she was told her tour would be changed from Tour 2 to Tour 3, and then on December 3, 2014, it was changed back again. D. Exhibit 23, p. 3, ¶¶ 12.

64. Plaintiff's tour was not changed. There was a discussion of a change of tour, which never materialized. Plaintiff never reported to a different tour of duty. D. Exhibit 24, p. 5, ¶¶. 21-22.

65. Plaintiff's subjective belief was that her age was a factor in this tour change issue. However, she does not explain how. D. Exhibit 23, p. 7, ¶ 26.

66. O'Keefe was not aware of Plaintiff's age. D. Exhibit 24, p. 2, ¶ 6.

### Plaintiff's Claim That Supervisor O'Keefe Constantly Checked the Status of the Tasks Assigned to Her

67. On or about December 1, 2014, Plaintiff felt that her supervisor, O'Keefe, constantly checked on the status of the tasks assigned to her. D. Exhibit 23, p. 4, ¶ 11-12, 14.

68. O'Keefe stated that Plaintiff had been out of work often and she was behind on her tasks. O'Keefe's superior inquired why the tasks assigned to Plaintiff were not done. While Plaintiff stated she was working on them, the work was not getting done. D. Exhibit 24, p. 6-7, ¶¶ 29-30.

69. Plaintiff's subjective belief was that her age was a factor in this tasks issue. D. Exhibit 23, p. 7, ¶¶ 26, 27.

70. O'Keefe was not aware of Plaintiff's age.  D. Exhibit 24, p. 2, ¶¶ 6, 7.

Plaintiff's Claim that Her Supervisor Would Not Approve

Plaintiff's Request for Sick Leave without Documentation

71. On December 1, 2014, Plaintiff submitted a U.S. Postal Service PS Form 3971, Request for or Notification of Absence to O'Keefe in order to request eight hours of sick leave to attend a medical appointment the she had scheduled for Thursday, December 8, 2014.  On December 5, 2014, Plaintiff submitted another PS Form 3971 to O'Keefe to attend another medical appointment scheduled for December 11, 2014.  D. Exhibit 23, p. 13, ¶¶ 41-42.

72. O'Keefe approved the two requested days of advanced sick leave but told Plaintiff she would need some type of supporting document from the provider, such as an appointment card, to attach to her slip and file.  D. Exhibit 24, p. 8, ¶¶ 35-36.

73. Plaintiff was requesting advance sick leave, and the Employee Labor Relations Manual Section 513.512, "[e]very request for advanced sick leave must be supported by medical documentation of the illness." D. Exhibit 26, p. 12, Section 513.512.

74. Plaintiff was granted and took the leave she requested.  D. Exhibit 24, p. 8, ¶ 37.

75. Plaintiff's subjective belief was that her age was a factor in this sick leave issue. However, she does not explain how. D. Exhibit 23, p. 7, ¶ 26.

<u>Plaintiff's Claim that She Was Forced to Retire</u>

76. Plaintiff states that, because of the issues named above, she felt forced to retire. D. Exhibit 23, pp. 17-18, ¶ 51.

77. O'Keefe was not aware Plaintiff felt harassed by her. D. Exhibit 24, p. 10, ¶ 44.

78. Galindo stated that Plaintiff never reported any alleged harassment to him or to anyone else. D. Exhibit 25, p. 3, ¶ 11.

79. Plaintiff applied for voluntary retirement in or about November or December 2014, effective on January 1, 2015. Plaintiff' notice did not mention that she was forced to retire or the harassment. D. Exhibit 23, pp. 18-19, ¶ 52; D. Exhibit 25, p. 3, ¶ 11.

80. On December 15, 2014, Galindo and O'Keefe first learned that Plaintiff intended on retiring, and both congratulated her on that same day. D. Exhibit 23, pages 18-19, ¶ 52; D. Exhibit 25, p. 3, ¶ 11.

## LEGAL ANALYSIS

ADEA is an anti-discrimination statute, and specifically prohibits discrimination based on one's age. Indeed, under the ADEA it is unlawful for an employer to "refuse to hire or to discharge any individual or otherwise discriminate against [her] with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).

Title VII, on the other hand, makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

Plaintiff's complaint is not very clear, but she raises several claims, mainly "age discrimination and gender discrimination which discrimination resulted in a hostile work environment that forced plaintiff to seek an early retirement." (Docket No. 1, p. 1). Therefore, Plaintiff seems to be alleging age and gender discrimination, which in turn created a hostile work environment which culminated with a constructive discharge. The Court examines each of these claims in turn.

**A. ADEA and Title VII claims.**

Where, as here, there is no direct evidence of age discrimination, at this stage courts evaluate ADEA claims under the three-stage burden-shifting framework set forth in McDonnell Douglas v. Green, 411 U.S. 792, 93 S.Ct. 1817 (1973). An employee suing under the ADEA must adduce evidence which, if believed, suffices to prove four facts: (1) she was at least 40 years old at the time of the materially adverse action; (2) she was qualified; (3) she suffered an adverse employment action attributable to the employer (typically, a firing) and (4) the employer subsequently filled the position with a younger person, demonstrating a continuing need for the plaintiff's services. Pierzchajio v. Northwestern Selecta, Inc., No. CV 17-1682 (PAD), 2019 WL 2323863, at *5 (D.P.R. May 31, 2019).

These threshold elements are substantially similar in a sex discrimination claims, where the employee must establish a *prima facie* case by showing that: (1) she belonged

to a protected class, (2) she performed her job satisfactorily, (3) her employer took an adverse employment decision against her, and (4) her employer continued to have her duties performed by a comparably qualified person. Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 54 (1st Cir. 2000).

In both instances, once a *prima facie* case is established, a rebuttable inference of discrimination arises, switching to the employer the burden of articulating a legitimate, nondiscriminatory reason for the challenged action. Id. This is a burden of production, not of persuasion, such that the employer is merely required to set forth, through the introduction of admissible evidence, reasons for its action which would support a finding that unlawful discrimination was not the cause of the challenged employment action. The plaintiff must then identify probative evidence that the reason given by the employer for its action is pretextual, that is, not its true reason but rather, is a pretext for discrimination.

In the present case, for both of these claims, the key issue is the "adverse employment action". An "adverse employment action" is one that "affect[s] employment or alter[s] the conditions of the workplace." See Morales-Vallellanes v. Potter, 605 F.3d 27, 35 (1st Cir. 2010) (*quoting* Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 62, 126 S.Ct. 2405 (2006)). The issue to be determined in an adverse employment action is whether it "materially change[s] the conditions of plaintiffs' employ." Gu v. Bos. Police Dep't, 312 F.3d 6, 14 (1st Cir. 2002). That change, in turn, "must be more disruptive than a mere inconvenience or an alteration of job responsibilities." Morales-Vallellanes, 605 F.3d at 35 (*quoting* Marrero v. Goya of P.R., Inc., 304 F.3d 7, 23 (1st Cir. 2002)). For

instance, "[r]eassignment with significantly different responsibilities" may be actionable.
Id. (*quoting* Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761, 118 S.Ct. 2257 (1998)).

As stated before, the following instances are the personnel actions Plaintiff
complains of:

1.      Letter of warning for unsatisfactory performance.

2.      Exclusion from participating in new In-Plant support projects and meetings
and was released from some of her assignments, which were given to other employees.

3.      Plaintiff was not mentored.

4.      Plaintiff was not trained to run all the reports in In-Plant support office.

5.      Plaintiff's tour was changed yet was reinstated again shortly thereafter.

6.      Constant supervisory oversight of Plaintiff's assigned tasks.

7.      Request for documentation before approval of advance sick leave requests.

8.      Plaintiff felt forced to retire.

The Court finds that none of the actions mentioned above, which occurred in a
span of several months, rises to the level of adverse employment action.  Plaintiff's main
responsibilities did not materially change, nor did her salary, and nothing like a
"reassignment with significantly different responsibilities" was made.  In fact, the only
possible reassignment, a shift change, never materialized.

For the sake of the argument, even giving Plaintiff the benefit of the doubt and
assuming she has met her *prima facie* burden, the Court finds Defendant has articulated
valid, non-discriminatory reasons for each of its actions.

Regarding the warning letter, the evidence in the record shows that Plaintiff made
repeated errors related to the update of computerized mail sorting programs, her main

responsibility, for which she had received some refresher course five months before, and which resulted in improper mail sorting on several occasions. Furthermore, a warning was also issued to two men, Robles and Rodríguez for the same violations she committed, which undermines her contention that when was singled out based on her sex. Finally, while Plaintiff is correct in stating that Reyes, who she claims was favored over her, was not disciplined for similar occurrences, the record clearly shows that after the issue was called to his attention, Reyes made no further errors. That was not the case with Plaintiff, who repeated her programming error on several occasions, which in turn caused recurrent improper mail sorting.

As to the exclusion from new projects and the taking away of others, the uncontested facts show that Plaintiff had her hands full with sort program maintenance tasks and was released from certain assignments with the MODS. This, in line with the company policy that any staff member could be released from any project and assigned to work on other projects with higher priority at any given time. In any event, Plaintiff was not fully taken away from the MODS responsibilities, as she was instructed to train Sierra in said system and was told "it is her responsibility to make the data techs 100% ready to take over MODS entirely", while she would still review the system for missing volume. This belies Plaintiff's claim that the MODS was taken away from her.

In relation to the allegation that Manager Calserrada assigned the 24-clock job to Reyes in April 2014, the record shows Reyes had previously been assigned that job by Manager Finneman, who was not included in Plaintiff's discrimination claims before the EEOC nor in the instant case.

Thus, it is evident that management chose to assign Plaintiff to projects where the required work was of her primary areas of responsibility and expertise, which is in line with company policies. Thus, Plaintiff has no evidence to back up her claims that she was removed from certain projects for discriminatory reasons. These are management decisions that are not up to Plaintiff.

Plaintiff's claim that, from March to May 2014, she was not invited to meetings and trainings to which other employees were invited fares no better, as decisions regarding whether to offer trainings, and to whom are also the exclusive right of agency management and are based on the company's operational needs. Additionally, the uncontested facts show that, during the relevant time period, Plaintiff did in fact attend meetings that involved her and/or pertained to her subject matter responsibilities and expertise. The evidence further shows that, on May 6, 2014, Manager Calserrada enrolled Plaintiff in the Sort Program Fundamentals course, which she had expressed an interest in. Plaintiff attended said course and she received 40 hours of training. This was done after Manager Calserrada sent an email to several employees, including Plaintiff, asking them what trainings they would be interested in. Management further offered to teach Plaintiff how to conduct Service Meetings, but she declined. Thus, Plaintiff cannot now cry foul at opportunities that were afforded to her and which she failed to take advantage of.

The claim that managers spent more time with Reyes than with Plaintiff during a relevant time period also fares poorly. In Defendant's defense, she avers that Reyes received more supervision because Reyes was assigned complicated projects that required managerial supervision. Plaintiff, an agency veteran who had occupied her position for

seven years at the time Reyes came on board, cannot seriously compare herself with a substantially more inexperienced employee.  Therefore, it is obvious that Plaintiff would require less managerial time and supervision and she has produced absolutely no evidence sustain her allegations of discrimination.

One of Plaintiff's general contentions is that Reyes was given more opportunities and was favored over her.  However, Reyes was also released from performing certain tasks (the Plant Verified Drop Shipment audits) because of his heavy workload.  This fact belies not only Plaintiff's assertion that she was singled out, but that Reyes was favored over her.   In exact circumstances for both Plaintiff and Reyes, heavy workloads, the same action was taken by management, to wit, reassigning those tasks to other employees.

Regarding the allegation that Plaintiff was not taught to run in plant support reports, the evidence of record established that in-plant support staff members taught each other how to run reports and Plaintiff knew how to run all said reports.  At a minimum, Plaintiff ran the AFSM At-Risk, Service Ranking, EXFC Service Performance, EXFC Daily, Machine Chart, DPS Lopping, and Daily Hour reports.  For some of the other reports Plaintiff complained of, her schedule precluded her from running them.

Plaintiff's allegation that her tour was changed is unfounded, as it is uncontested that there was a discussion of a possible change, but it never took place.

Regarding Plaintiff's claims of constant follow-up by her supervisor, it is uncontested that Plaintiff was behind in her work because she had been on sick leave.   As a supervisor, O'Keefe had an obligation to obtain work status updates and Plaintiff has shown absolutely no discriminatory animus in a supervisor asking a subordinate for work updates when it was not timely performed.

Moreover, regarding Plaintiff's claim that O'Keefe would not approve her request for sick leave without documentation, the evidence shows that O'Keefe was complying with the Postal Service Employee Labor Relations Manual section 513.512, which requires that advance sick leave, which was what Plaintiff was requesting, be supported by medical documentation of the illness. Furthermore, Plaintiff supplied the documentation and her leave was granted, so the Court can find no ill intent in Defendant's request. On the contrary, Defendant strictly complied with its internal regulations and granted the leave request after the evidentiary requirements had been complied with.

Finally, although Plaintiff states she "felt forced" to retire, the Court notes that nowhere in her retirement papers did Plaintiff aver she was being forced to retire, nor did she inform Defendant at any time of the harassment claims that allegedly prompted her retirement. There is no evidence to sustain this claim but for Plaintiff's personal view.

It is important to note that it is not the Court's role to act as the company's guardian regarding personnel supervision, but rather to ensure no violations of the law occur. Byrnie v. Bd. of Educ., 243 F.3d 93, 103 (2d Cir.2001) ("[The court's] role is to prevent unlawful hiring practices, not to act as a super-personnel department that second guesses employers' business judgments.") (*quoting* Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs., 165 F.3d 1321, 1330 (10th Cir. 1999)); Rojas v. Florida, 285 F.3d 1339, 1342 (11th Cir. 2002) (federal courts "are not in the business of adjudging whether employment decisions are prudent or fair. Instead, our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision").

In sum, the challenges made to Defendant's actions seem to be no more than work-related grievances which do not rise to the level of adverse employment actions.

Defendant has furthermore provided more than adequate justifications for all of the actions which it undertook, most of them business decisions that fall entirely within the purview of the agency. At this stage, Plaintiff must present evidence to rebut Defendant's proffered reasons and establish that they were pretextual in nature and that the real reasons for the actions she complains of stemmed from age or gender related discriminatory animus. She has been unable to do so.

While Plaintiff offered a sworn statement in support of her opposition, she failed to present any evidence in support thereof except conjecture, which is fatal to her claims at this stage. See Mariani-Colón v. Dep't of Homeland Sec. ex rel. Chertoff, 511 F.3d 216, 222 (1st Cir. 2007) (Proof of more than appellant's subjective belief that he was the target of discrimination is required). The statement is almost a copy and paste of Plaintiff's complaint, which is wholly conclusory and is insufficient at this stage because more is needed at summary judgment. Although at this stage all inferences are drawn in favor of Plaintiff, she cannot survive summary judgment with "'unsupported allegations and speculations,' but rather must 'point to specific facts detailed in affidavits and depositions—that is, names, dates, incidents, and supporting testimony—giving rise to an inference of discriminatory animus.'" Plaza-Torres v. Rey, 376 F. Supp. 2d 171, 185 (D.P.R. 2005) (citing Lipsett v. University of Puerto Rico, 864 F.2d 881, 895 (1st Cir. 1988)). Plaintiff has failed to meet this threshold.

The unsworn declaration by José Ruiz-Justiniano ("Ruiz-Justiniano") fares no better, as he is limited to simply stating he did not see Plaintiff at some meetings and that he recalled managers speaking to Reyes about some projects and not to Plaintiff. Nonetheless, he fails to point to any discriminatory words he might have heard or how

these actions by themselves were discriminatory. Noticeably, the Court must mention that Plaintiff's complaint avers that Defendant "treats a subclass of women of older age, near retirement, in non-executive positions differently". (Docket No. 1. ¶ 31). Ruiz-Justiniano's statement only talks about Plaintiff, and no one else. The fact that Plaintiff was a woman belonging to that certain class that Ruiz-Justiniano did not see at some meetings is insufficient to carry Plaintiff's burden across the summary judgment hurdle.

Defendant has further provided a non-discriminatory justification for Plaintiff's exclusion from said meetings, and Ruiz-Justiniano has no knowledge as to the reasons why such exclusions were made and cannot say that the exclusions were made because of Plaintiff's age and sex. The statement is therefore insufficient to create an issue of material fact, particularly when Defendant's proffered reasons for its actions, which Ruiz-Justiniano knows nothing about, stand uncontested. See Brisbin v. Aurora Loan Servs., LLC, 679 F.3d 748, 754 (8th Cir. 2012) ("self-serving affidavit not sufficiently specific to raise genuine issue of material fact in face of uncontradicted facts in record").[2]

In conclusion, Plaintiff has failed to provide evidence to establish that Defendant's actions were a pretext for age and sex discrimination. In other words, she has not established that age or her sex was a factor in the decision-making process or that the process was somehow purposely skewed against her for those discriminatory reasons.

---

[2] In her sur reply, Plaintiff avers Defendant stated in its Reply brief that Ruiz-Justiniano had submitted no information during the initial EEO investigation. This is plainly incorrect, as it was *Plaintiff herself* who submitted this as a proffered fact in her opposition to summary judgment (Docket No. 31-2, letter N). While Ruiz does state in the EEO report that "Silma Gautier was never included for the on the job training offered to the other OSS Efrain Reyes", he also states that "no hostile (sic) nor harassment was observed", because the question asked of him was whether he observed Plaintiff being subjected to a hostile work environment and harassment, not whether he witnessed any discriminatory actions. In any event, this same allegation of failure to include Plaintiff in trainings and projects was mentioned in Ruiz' unworn declaration, which as previously discussed, is insufficient for Plaintiff to clear the summary judgment hurdle.

The fact that other, younger men were also issued warnings and whose tasks were also changed, as with Plaintiff, belie her assertions that Defendant's actions stemmed from discriminatory age and sex animus.   Additionally, while Plaintiff contends that she "felt" humiliated and discriminated against in her argument that Defendants' actions here were discriminatory, she proffers no evidence in support of these conclusions.   While Plaintiff continually argues that it was her "belief" that her age was a factor in the actions undertaken by Defendant, she fails to submit evidence in support of her allegations other than the fact that she is a woman and is over 40 years of age.  More is needed at summary judgment.  See Santiago v. Canon U.S.A., Inc., 138 F.3d 1 (1st Cir. 1998) ("A plaintiff [claiming discrimination] 'may not prevail simply by asserting an inequity and tacking on the self-serving conclusion that the defendant was motivated by a discriminatory animus.'").

In view of the above, Plaintiff has failed to raise a genuine issue of fact as it pertains to age and sex in the actions complained of.   Accordingly, Defendant's Motion for Summary Judgment is GRANTED, and Plaintiff's sex and age discrimination claims are DISMISSED WITH PREJUDICE.

## B.  Hostile work environment

To prove a hostile work environment, a Plaintiff must provide sufficient evidence from which a reasonable factfinder could determine that the workplace was "permeated with discriminatory intimidation, ridicule, and insult that was sufficiently severe or pervasive to alter the conditions of ... [her] employment and create an abusive working environment." Quiles-Quiles v. Henderson, 439 F.3d 1, 7 (1st Cir. 2006) (*quoting* Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S.Ct. 367, (1993)).  The offensive conduct, in other

words, must be "[(1)] severe [or] pervasive enough to create an objectively hostile or abusive work environment and [(2)] subjectively perceived by the victim as abusive." Landrau-Romero v. Banco Popular de P.R., 212 F.3d 607, 613 (1st Cir. 2000). "This is not, and by its nature cannot be, a mathematically precise test." Harris, 510 U.S. at 22, 114 S.Ct. 367.  The question whether the environment is objectively "hostile or abusive" must be answered by reference to "all the circumstances," including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 21, 114 S.Ct. 367; Pomales v. Celulares Telefónica, Inc., 447 F.3d 79, 83 (1st Cir. 2006).

It has been widely held that simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment to establish an objectively hostile or abusive work environment.  Colón-Fontánez v. Mun. of San Juan, 660 F.3d 17 (1st Cir. 2011) (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 788, 118 S.Ct. 2275 (1998)).  Still, Courts have also made clear that "[f]requent incidents of harassment, though not severe, can reach the level of 'pervasive,' thereby altering the terms, conditions, or privileges of employment such that a hostile work environment exists." Id.; see also Flood v. Bank of Am. Corp., 780 F.3d 1, 11-12 (1st Cir. 2015) (explaining that "[w]e have upheld hostile work environment claims where harassment has been more pervasive than severe"); and Noviello v. City of Boston, 398 F.3d 76, 92 (1st Cir. 2005) ("rudeness or ostracism, standing alone, usually is not enough to support a hostile work environment claim.") .

In this district and in the First Circuit, Courts have found differing actions for the basis of hostile work environment. See Marrero, 304 F.3d at 19 (explaining hostile work environment based on sex could be shown where harassment was "more or less constant ... [as] distinguished from ... comments that are few and far between"); White v. N.H. Dep't of Corrs., 221 F.3d 254, 260 (1st Cir. 2000) (explaining hostile work environment based on sex could be demonstrated where plaintiff showed "disgusting comments [from colleagues and superiors] ... occurred 'everyday' [sic]").

In the age modality, Courts have found that evidence that the employer referred to the plaintiff on a daily basis as "anciana," "vieja," "abuela," "she was too old and should retire" was insufficient. Villegas-Reyes v. Universidad Interamericana de P.R., 476 F. Supp. 2d 84, 91 (D.P.R. 2007); see also, Marrero v. Schindler Elevator Corp., 494 F.Supp.2d 102, 110 (D.P.R. 2007) (summary judgment granted despite evidence that that plaintiff was called "viejo," "viejito," and "viejo pendejo" on a daily basis by employer).

Turning to the instant case, no such comments were made to Plaintiff. Furthermore, there is no evidence on the record that lewd comments were made to Plaintiff, that she was inappropriately touched or looked at, or that she was called derogatory, age related names frequently or on a daily basis. Instead, Plaintiff argues that the personnel actions performed by Defendant constituted a hostile work environment. Although not worded this way, Plaintiff asserts that these actions culminated in a constructive discharge, as she was forced to retire.

To take the measure of a claim of constructive discharge, the Court must determine whether the working conditions imposed by the employer had become so onerous, abusive, or unpleasant that a reasonable person in the employee's position would have

felt compelled to resign.  See Vega v. Kodak Caribbean, Ltd., 3 F.3d 476, 480 (1st Cir. 1993).  This standard cannot be triggered solely by an employee's subjective beliefs, no matter how sincerely held, because the ultimate test is one of objective reasonableness. See Serrano-Cruz v. DFI P.R., Inc., 109 F.3d 23, 26 (1st Cir.1997); Calhoun v. Acme Cleveland Corp., 798 F.2d 559, 561 (1st Cir. 1986) ("the law does not permit an employee's subjective perceptions to govern a claim of constructive discharge").  Thus, whatever Plaintiff personally believed must take a back seat to what a reasonable person would have felt in the same situation.

In making this determination, the Court is reminded that the workplace is not a cocoon, and those who labor in it are expected to have reasonably thick skins, that is, thick enough, at least, to survive the ordinary slings and arrows that workers routinely encounter in a hard, cold world.  See Calhoun, 798 F.2d at 561.  Thus, the constructive discharge standard, properly applied, does not guarantee a workplace free from the usual ebb and flow of power relations and inter-office politics.  Id.

Thus, for both the harassment claim and the constructive discharge, Plaintiff must establish than her working conditions were so permeated by ridicule and so onerous that no reasonable person would be compelled to stay working there.  The Court cannot find that the actions complained of in the case at bar meet this threshold and cannot conclude either that these actions were sufficiently harassing to constitute a hostile environment, much less show a constructive discharge.  Although the actions here spanned a time frame of approximately nine months, the Court finds they were not constant, or pervasive, or severe.  They were more akin to administrative actions taken by the agency in furtherance of a better work product.

Moreover, there is also no evidence that the actions were physically threatening to Plaintiff, or that they were humiliating actions, such as a supervisor shouting or berating the employees, besides Plaintiff's self-serving opinion.

Finally, there is no evidence that the actions complained of unreasonably interfered with Plaintiff's job and, as discussed above, Defendant has proffered uncontested evidence establishing valid, business reasoning behind each of the actions complained of which Plaintiff has been unable to rebut a this stage.

For these reasons, the Court finds the harassment and constructive discharge claims cannot lie. Consequently, Defendant's Motion for Summary Judgment is GRANTED, and Plaintiff's harassment and constructive discharge claims are DISMISSED WITH PREJUDICE.

## CONCLUSION

In view of the foregoing, the Court GRANTS Defendant's Motion for Summary Judgment (Docket No. 26). Thus, all claims brought by Plaintiff Gautier against Defendant Megan J. Brennan, Postmaster General are DISMISSED WITH PREJUDICE.

Judgment will be entered accordingly.

IT IS SO ORDERED.

In San Juan, Puerto Rico, on this 28th day of June, 2019.

S/CAMILLE L. VELEZ-RIVE
CAMILLE L. VELEZ RIVE
UNITED STATES MAGISTRATE JUDGE